IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DIANA MEY, individually and on behalf of a
class of all persons and entities similarly situated,

    Plaintiff,

v.                                                                                          CASE NO. 5:11-CV-90

MONITRONICS INTERNATIONAL, INC.;
VERSATILE MARKETING SOLUTIONS, INC.,
d/b/a/ VMS ALARMS;
ALLIANCE SECURITY, INC.; and
UTC FIRE AND SECURITY AMERICAS CORP., INC.,

    Defendants.

## THIRD AMENDED CLASS ACTION COMPLAINT

### I. Preliminary Statement

1.    Twenty years ago, Congress recognized that unsolicited telemarketing calls are a common nuisance and an unreasonable intrusion on citizens' privacy, and enacted the Telephone Consumer Protection Act of 1991, or TCPA, to regulate telemarketing. Among other things, the TCPA prohibits telemarketing calls to persons and entities who list their telephone numbers on the national Do Not Call Registry. The TCPA places responsibility for violations not only on businesses that *place* calls to persons listed on the Registry, but also on businesses *on whose behalf* the calls are made. Here, Defendant VMS Alarms (now Alliance Security, Inc.), hoping to sell Plaintiff Diana Mey an alarm system and monitoring services she neither wanted nor needed, initiated dozens of telemarketing calls to Ms. Mey, despite the fact she had listed her number on the Do Not Call Registry. VMS Alarms placed these calls on behalf of Defendants UTC and Monitronics, for whom it was an authorized dealer of alarm systems and

646536

monitoring services, respectively. Under the TCPA, each of the three companies is liable for the illegal calls made on their behalf, and in furtherance of their joint venture. Ms. Mey brings this action individually and on behalf of a class to enforce the TCPA and recover statutory damages (but not actual damages) for the Defendants' violations.

## II.  Parties

2.      Plaintiff Diana Mey ("Ms. Mey") is an individual with a principal residence in Wheeling, West Virginia.

3.      Defendant UTC Fire and Americas Corporation, Inc. is a foreign corporation. It sometimes does business as GE Security, and is referred to herein as "UTC," "GE Security" or "GE."

4.      Defendant Monitronics International, Inc. ("Monitronics") is a Texas corporation with a principal place of business at 2350 Valley View Lane, Suite 100, Dallas, Texas.

5.      Defendant Versatile Marketing Solutions, Inc., d/b/a VMS Alarms ("VMS") is a Rhode Island corporation with a principal place of business at 60 Jefferson Park Road in West Warwick, Rhode Island.

6.      Defendant Alliance Security, Inc. ("Alliance") is a Delaware limited liability company with a principal place of business located at 60 Jefferson Park Road, Warwick, Rhode Island, 02888.

7.      Upon information and belief, Alliance Security, Inc. is the new corporate name of VMS. All allegations in this complaint regarding VMS are also alleged with respect to Alliance. VMS and Alliance are collectively referred to herein as "VMS."

8.      At all relevant times, each Defendant conducted business in West Virginia, solicited business in West Virginia, engaged in a persistent course of conduct in West

Virginia, and/or has derived substantial revenue from services provided in West Virginia.

9. Each Defendant is jointly and severally liable for the conduct alleged in this complaint.

### III. The Legal Basis for the Complaint

***The TCPA prohibits telemarketing calls made to persons
and entities listed on the Do Not Call Registry***

10. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]unrestricted telemarketing . . . can be an intrusive invasion of privacy[.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

11. In 1995, under its authority to adopt rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, the FTC adopted the Telemarketing Sales Rule, 16 C.F.R. § 310, which was later amended in 2003. Among other things, the amended TSR established a "Do Not Call Registry." The Registry lists the telephone numbers of consumers who have informed the FTC that they do not wish to receive certain types of telemarketing calls.

12. The TCPA prohibits persons or entities from initiating telephone solicitations to registered telephone subscribers. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c). A person whose number is on the Registry, and who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the TCPA, can sue the violator and seek statutory damages. 47 U.S.C. § 227(c)(5).

13. The law contains a safe harbor provision that exempts from liability a person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) who has obtained the subscriber's prior express invitation or permission to make the call. 47 C.F.R. § 64.1200(c)(2)(ii).

14. Such permission must be evidenced by a signed, written agreement between the consumer and seller that states the consumer agrees to be contacted by this seller, and includes the telephone number to which the calls may be placed. 47 C.F.R. § 64.1200(c)(2)(ii).

15. Ms. Mey, and the class she seeks to represent never gave written consent to receive calls from the Defendants.

### *TCPA "on behalf of" liability*

16. Under the TCPA, a person or entity can be liable for calls made on its behalf, even if the person or entity does not directly place or initiate the calls. 47 U.S.C. § 227(c)(5).

17. As explained by the FCC, the agency charged with interpreting and enforcing the TCPA, the applicable rules "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Memorandum and Order, 10 FCC Rcd. 12391, 12397¶ 13 (1995).

18. The FCC reiterated this principle in 2005, when it stated that "a company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules and calls placed by a third party on behalf of that company are treated as if the company itself placed the call." *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Request of State Farm

Mutual Automobile Insurance Company for Clarification and Declaratory Ruling, Declaratory Ruling, 20 FCC Rcd. 13664, 13667 ¶ 7 (2005).

19. The calls placed or initiated to Ms. Mey, and to the class she seeks to represent, were made by or on behalf of all three Defendants within the meaning of the TCPA, as defined by the FCC, which renders each Defendants jointly and severally liable for those calls.

## IV. The Factual Basis for the Complaint

### *The Defendants' joint venture*

20. The Defendants work jointly to promote the sale of their goods and services.

21. UTC is a leading manufacturer of residential and commercial electronic security and alarm systems.

22. Monitronics is a leading provider of monitoring services for residential and commercial electronic security and alarm equipment.

23. VMS is a leading seller of residential and commercial electronic security and alarm equipment and monitoring services.

24. UTC, VMS and Monitronics are participants in a joint venture, and share in its costs and its profits. The purpose of the joint venture is to sell home-security equipment and home-security monitoring services.

25. VMS's role in the joint venture essentially is to act as the marketing department of UTC and Monitronics.

26. VMS serves this role because neither Monitronics nor UTC regularly sells their products or services direct to consumers, but instead depend on dealers like VMS for such sales.

27. VMS relies exclusively on telemarketing to generate new customers—a fact both UTC and Monitronics have known since the inception of their relationship with VMS.

28. During the course of its telemarketing efforts, VMS arranges to contract with new customers using form alarm-monitoring contracts written by Monitronics.

29. VMS then sells or assigns more than ▇▇ of all its alarm-monitoring contracts to Monitronics for a price exceeding ▇▇▇ per contract.

30. In fact, Monitronics' marketing materials describe VMS as a "100% Monitronics dealer," and VMS regularly is at or near the top of Monitronics' list of sales-generating dealers nationwide.

31. For Monitronics, VMS's telemarketing efforts generate ▇▇▇▇ customers and ▇▇▇▇▇▇▇▇▇▇ in monitoring fees.

32. Monitronics rewards VMS for its telemarketing sales efforts with cash payments and perks, and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇.

33. Similarly, VMS's telemarketing efforts have generated millions of dollars in sales of security systems for UTC.

34. Like Monitronics, UTC does not market direct to consumers, but instead relies on the marketing and sales efforts of dealers such as VMS.

35. VMS uses the names Monitronics and GE Security in its marketing efforts, and is authorized to do so.

36. In sum, each Defendant is dependent on one another, and all combine their property, money, effects, skill and knowledge to achieve profits for each Defendant.

### *Calls made by or on behalf of the*
### *Defendants to Diana Mey*

37. Since 2003, Ms. Mey's residential phone number (xxx) xxx-1943 has been listed on the Do Not Call Registry.

38. A listing on the Registry can only be revoked in writing. At no time has Ms. Mey revoked her listing on the Do Not Call Registry.

39. Nonetheless, beginning November 16, 2009, through as recently as December 20, 2011, Ms. Mey received dozens of telemarketing calls initiated by or on behalf of the Defendants.

40. The calls generally followed the following pattern: Initially, Ms. Mey would receive a telemarketing call, usually from a heavily-accented caller employed in India by a company called "Total Survey Solutions." The caller would purport to be conducting a "safety survey," would inquire about whether Ms. Mey owned her own home, and would ask a series of questions about existing security systems in the home. The call generally followed the script attached hereto as Exhibit 1. The caller would conclude the call by telling Ms. Mey that because she had participated in the "survey," she "could be selected" to receive a free GE security system.

41. In truth, the "survey" was intended to generate sales leads for VMS.

42. The Indian company that performed the "surveys" made thousands of survey calls to American consumers on behalf of VMS, and sent VMS thousands of sales leads.

43. VMS compensated the Indian company for these sales leads based in large part on whether the leads generated sales for VMS.

44. Next, after VMS received the sales leads obtained on its behalf, a VMS employee would make a second call to Ms. Mey, the contents of which were guided by the sales script attached hereto as Exhibit 2.

45. At no time did VMS "scrub" its sales leads against the federal Do Not Call Registry to ensure that persons and entities who had listed their telephone numbers on the Registry would not receive calls.

46. At no time prior to making calls to Ms. Mey did VMS scrub the DNC Registry to ensure that Ms. Mey was not listed on the Registry.

47. This failure to scrub the sales leads resulted in hundreds and even thousands of unlawful telemarketing calls to persons on the Registry, including the Plaintiff.

48. None of the recipients of these calls, including the Plaintiff, had consented in writing to receive calls from or on behalf of the Defendants.

49. During the course of the second call, the VMS representative would inform the Plaintiff that she had "participated in our Home Safety survey" and that she had been selected to receive a "free" $1200 General Electric wireless security system. According to the script, to receive her free system the Plaintiff would need to pay an activation fee and a monthly monitoring fee.

50. Because VMS failed to scrub its sales leads against the DNC Registry, Plaintiff received dozens of these calls from or on behalf of the Defendants, all in violation of federal Do Not Call provisions and the TCPA.

51. During several of these calls, the callers made statements to the effect that VMS made telemarketing sales calls on behalf of the other Defendants, and that each Defendant was involved in VMS's telemarketing sales campaign. For example:

    a. On September 15, 2010, Ms. Mey received a telemarketing call from caller ID "(352) 352-0352."  When Ms. Mey answered the phone, the caller told her she worked for Monitronics.  When Ms. Mey began asking questions to determine who was behind the calls, a supervisor informed her he was located in Rhode Island (the state where VMS is headquartered), but refused to provide additional information and terminated the call after Ms. Mey pressed for more information.

    b. On March 23, 2011, Ms. Mey received a call from "Megan with VMS." Megan told Ms. Mey that "General Electric" would be giving her a $1200 security system for free, stated the earlier "survey" that Ms. May received was sponsored by General Electric, and characterized the survey as "one of our General Electric Safety Surveys."

    c. Later that day, Ms. Mey received a call from a VMS manager named Dennis Castro.  Mr. Castro emphasized VMS's connection to Monitronics, whom he called "the number one monitoring service in the country."  He told Ms. Mey that VMS was GE's "partner," and told her "there's only a handful of companies in the world that partners [sic] with General Electric."  He also told Ms. Mey that GE performed the safety survey.

    d. On another occasion, July 11, 2011—months after this lawsuit was filed—Ms. Mey received a call from caller ID "401-654-5377 Providence RI."  Ms. Mey spoke with a VMS employee named Matthew Jay who told her that "VMS General Electric Alarms" had selected her to receive a $1200 security system with free installation.  Mr. Jay stated, falsely, he was "not actually a salesman," but was instead calling to "go over the details" with Ms. Mey, and that he had "been doing installations in West Virginia for a very long time."

   e. Mr. Jay made a number of representations about the intertwined nature of the relationship between the three Defendants. He told Ms. Mey he worked for both General Electric and VMS, and described VMS as a "local authorized General Electric dealership."

   f. Mr. Jay told Ms. Mey that Monitronics was VMS's alarm monitoring company, that VMS was the "same company" as Monitronics, and that GE and Monitronics were "same company."

   g. On July 25, 2011—again, months after this lawsuit was filed—Ms. Mey received a call from a heavily-accented man who identified himself as "Ricky from VMS, your local General Electric dealer," although the caller ID had been manipulated to falsely reflect that the call was from "POLITICAL RP 406-948-8852." Ricky told Ms. Mey he was calling from "the promotional department in Tampa, Florida," said he would have a manager call her back, but hung up the phone before Ms. Mey could get more information.

   h. Later that day, a VMS employee named Jeff called Ms. Mey. Jeff reminded Ms. Mey that he had just spoken with Ricky about the General Electric Security system. During the course of the call, he represented that GE, Monitronics, and VMS were separate entities, but were "partners," and that GE "sponsored" the initial survey.

   i. On July 28, 2011, Ms. Mey received a call from a thick-accented woman who identified herself as "Michelle . . . from VMS Alarms, your General Electric dealer." Michelle stated that she was calling because "General Electric has randomly selected you to receive a new wireless home security system at no charge." During the call, another employee named "Richard," who identified himself as a senior supervisor with VMS,

came on the line.  Ms. Mey told Richard not to call her again, and to take her number off his call list.  Ms. Mey told Richard she wanted a copy of the company's written telemarketing policy, but Richard hung up on Ms. Mey.

j.  Beginning October 26, 2011, Ms. Mey received a series of calls, some from numbers with blocked caller IDs, from callers purporting to be calling from GE and Monitronics.

k.  On an earlier occasion, Ms. Mey spoke with a VMS representative and asked to speak with a manager about the services.  A manager named "Ryan" called Ms. Mey from a number identified on her caller ID as originating from "401-533-9592 MONITRONICS."

52.  As recently as December 20, 2011, Ms. Mey has received calls from the Indian telemarketing "survey" company purporting to conduct a safety survey.

### *The Defendants' awareness of consumer complaints about their telemarketing practices*

53.  Ms. Mey is not the only consumer who received illegal calls from or on behalf of VMS, Monitronics and UTC.  For several years, consumers have been complaining to the Federal Trade Commission and directly to the companies that the telemarketing calls being made on their behalf were unlawful.

54.  In July of 2010, the Attorney General for the State of Pennsylvania, following an investigation, fined VMS for telemarketing in violation of Pennsylvania's Do Not Call registry.

55.  Upon information and belief, although UTC and Monitronics have long been aware of the unlawful telemarketing practices utilized by VMS to forward their joint venture, UTC and Monitronics have taken insufficient steps to ensure that any

telemarketing being conducted on their behalf by VMS complied with all applicable laws.

56. In 2010, UTC honored VMS for its success as a dealer of GE Security products, and awarded VMS its Freedom Award, which is presented to qualifying GE Security dealers who have top product sales and customer satisfaction.

57. UTC awarded this honor despite knowing that VMS was engaged in illegal telemarketing practices on behalf of VMS and UTC.

58. In 2011, Monitronics recognized VMS with its Dealer of the Year Award.

59. Monitronics honored VMS despite its awareness that VMS was engaged in illegal telemarketing practices on behalf of VMS and Monitronics.

## V. Class Action Allegations

60. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of classes of all other persons or entities similarly situated throughout the United States.

61. Upon information and belief, over the past four years, pursuant to a uniform policy and procedure, UTC. Monitronics and VMS have jointly engaged in widespread telemarketing in violation of the TCPA.

62. Upon information and belief, pursuant to a uniform policy and procedure, VMS, Monitronics and UTC did not obtain the prior express written consent of recipients of their telemarketing calls whose numbers were listed on the Do Not Call Registry, prior to the transmission of telemarketing calls to those phone numbers.

63. The class of persons Plaintiff proposes to represent with respect to Counts One and Two is tentatively defined as all persons or entities within the United States whose phone numbers were registered on the Do Not Registry, and who, within the four

years prior to the filing of the initial Complaint, received more than one telemarketing call within any twelve-month period of time from Defendants VMS or Alliance (or their agents, lead generators, or affiliated companies), on behalf of any of the Defendants promoting their goods or services.

64. The members of the classes are identifiable by phone records and phone number databases, employed by VMS, UTC and Monitronics, or their agents, in transmitting telemarketing calls to members of the class. On information and belief, the potential class members will be sufficiently numerous that joinder of all class members is impracticable.

65. Plaintiff is a member of the classes.

66. There are questions of law and fact common to Plaintiff and to the proposed classes, including but not limited to the following:

    a. Whether VMS, UTC and Monitronics violated the TCPA by engaging in telemarketing in violation of the TCPA.

    b. Whether the telemarketing calls made to class members by or on behalf of VMS were made on behalf of UTC and Monitronics;

    c. Whether the telemarketing calls sent to class members by VMS were "telephone solicitations";

    d. Whether the Plaintiff and the members of the class are entitled to statutory damages as a result of the defendants' actions.

67. Plaintiff's claims are typical of the claims of the classes.

68. Plaintiff is an adequate representative of the classes because her interests do not conflict with the interests of the class members, she will fairly and adequately protect the interests of the class members, and she is represented by counsel skilled and experienced in class actions.

69. The actions of VMS, Monitronics and UTC are generally applicable to the classes as a whole and to Plaintiff.

70. Common questions of law and fact predominate over questions affecting only individual members of the classes, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendants and/or their agents.

71. The likelihood that individual members of the classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

72. Plaintiff is capable of and is willing to represent the other members of the classes.

### VI.  Legal Claims

#### Count One:
#### All Defendants committed negligent violations of the
#### TCPA's Do Not Call provisions

73. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

74. Each Defendant negligently violated the TCPA by making telephone solicitations to persons and entities whose phone numbers were listed on the Do Not Call Registry, or by the fact that others made such calls on their behalf.

#### Count Two:
#### All Defendants committed knowing violations of the
#### TCPA's Do Not Call provisions

75. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

76. Each Defendant knowingly violated the TCPA by making telephone solicitations to persons and entities whose phone numbers were listed on the Do Not Call Registry, or by the fact that others made such calls on their behalf.

### Count Three
### Injunctive relief to bar future TCPA violations

77. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

78. The TCPA expressly authorizes injunctive relief to prevent further violations of the Telephone Consumer Protection Act.

79. The Plaintiff, acting on behalf of the Class, respectfully petitions this Court to order all defendants, including but not limited to Defendants, their employees, agents or independent distributors, to immediately cease engaging in unsolicited telemarketing in violation of the TCPA.

### Count Four
### Injunctive relief to preserve evidence

80. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

81. The Defendants, or their agents, have custody and control of the business records and other information necessary to identify the members of the class including names and telephone numbers.

82. Unless immediate injunctive relief is ordered, it is feared that the Defendants will alter, erase, delete, destroy or otherwise dispose of the records in their possession which are necessary to identify each recipient of the illegal telemarketing calls at issue.

83. For this reason, the Plaintiff petitions the Court for an order enjoining Defendants and their agents, or anyone acting on their behalf, from altering, deleting or destroying any documents or records which could be used to identify the members of the class.

## VII.  Relief Sought

On behalf of herself and the other members of the class, Plaintiff requests the following relief:

1. That the Court certify the claims of the named plaintiff and all other persons similarly situated as class action claims under Rule 23 of the Federal Rules of Civil Procedure;

2. For negligent violations of the TCPA, a $500 penalty awarded to the Plaintiff and each class member for each telemarketing call made by or on behalf of any Defendant;

3. For knowing violations of the TCPA, a $1500 penalty awarded to the Plaintiff and each class member for each telemarketing call made by or on behalf of any Defendant;

4. That the Defendants, and their agents, or anyone acting on their behalf, be immediately restrained from altering, deleting or destroying any documents or records which could be used to identify the members of the class; and

5. That the named plaintiff and the members of the class be granted such other and further relief as is just and equitable under the circumstances.

**Jury trial demanded.**

Plaintiff Diana Mey,
By Counsel


 /s/ John W. Barrett
John W. Barrett
Jonathan R. Marshall
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 *facsimile*

Edward A. Broderick, Esq.
Broderick Law, P.C
125 Summer St., Suite 1030
Boston, MA 02110
(617) 738-7080
(617) 314-7783 facsimile
ted@broderick-law.com
(visiting attorney)

Matthew P. McCue, Esq.
Law Office of Matthew P. McCue
1 South Avenue, Suite 3
Natick, Massachusetts 01760
(508) 655-1415
(508) 319-3077 facsimile
mmccue@massattorneys.net
(visiting attorney)


*Counsel for Plaintiff*