UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

IN RE MONITRONICS INTERNATIONAL,
INC. TELEPHONE CONSUMER
PROTECTION ACT LITIGATION

MDL No. 1:13-MD-2493

This document relates to:

*Bennett v. Monitronics International, Inc.*
Case No. 1:14-CV-00034

*Charvat v. Monitronics International, Inc.*
Case No. 1:14-cv-162

*Dolemba v. Monitronics International, Inc., et al.*
Case No. 1:14-CV-00066

*Hodgin et al. v. Monitronics, International, Inc.*
Case No. 1:13-CV-00263

*Mey v. Monitronics, International, Inc., et al.*
Case No. 5:11-CV-90

*Mey et al. v. Honeywell International, Inc. et al.*
Case No. 1:14-CV-00059

*O'Shea v. Alliance Security, LLC, et al.*
Case No. 1:13-CV-00264

**SECOND AMENDED MASTER CONSOLIDATED COMPLAINT**

738243

# TABLE OF CONTENTS

I.    Introduction and Statement of the Case ......................................................... 1

II.   Jurisdiction and Venue ................................................................................... 3

III.  Parties and Definitions .................................................................................. 4

IV.   Applicable Law .............................................................................................. 6

    A.   TCPA § 227(b) regulates autodialer and artificial or prerecorded voice calls to cellular and residential phones. .......................................................... 6

    B.   TCPA § 227(c) regulates telemarketing calls made to phone numbers listed on the Do Not Call Registry. ........................................................................ 7

    C.   The TCPA imposes liability on entities that do not directly place illegal calls. ........ 8

V.    Factual Basis for the Complaint ..................................................................... 9

    A.   Allegations regarding calls placed to Plaintiffs. ....................................... 9

        Plaintiff Jason Bennett ........................................................................ 10

        Plaintiff Edith Bowler ......................................................................... 10

        Plaintiff Philip J. Charvat ................................................................... 12

        Plaintiff Scott Dolemba………………………...……………………..12

        Plaintiffs Michael and Janet Hodgin .................................................. 13

        Plaintiff James "Garry" Hough ........................................................... 13

        Plaintiff Diana Mey ............................................................................ 15

        Plaintiff Kerry O'Shea ........................................................................ 20

    B.   VMS/Alliance placed telemarketing calls in violation of the TCPA ...................... 22

    C.   ISI Alarms placed telemarketing calls in violation of the TCPA. ........................... 22

    D.   UTC is liable for the TCPA violations of UTC Authorized Dealers ........................ 22

    E.   Monitronics is liable for the TCPA violations of Monitronics Authorized Dealers.26

    F.   Honeywell is liable for the TCPA violations of UTC Authorized Dealers ............. 30

VI.   Class Action Allegations ............................................................................... 32

i

VII.    Legal Claims ....................................................................................................... 34

VIII.   Relief Sought ...................................................................................................... 35

## I.   INTRODUCTION AND STATEMENT OF THE CASE

1.      According to the Federal Trade Commission's recent Biennial Report to Congress, the emergence of new communications technologies has caused the number of illegal telemarketing calls to explode in the last four years. For example, VoIP technology allows callers to make higher volumes of calls inexpensively from anywhere in the world. Telemarketers have embraced these technological advances, causing consumer complaints about illegal telemarketing calls to skyrocket, rising from 63,000 per month in 2009, to approximately 200,000 per month in 2012.

2.      The sheer volume of illegal telemarketing overwhelms the enforcement efforts of government agencies such as the FTC and the Federal Communications Commission. Consequently, private consumer enforcement actions, which Congress authorized when it enacted the TCPA in 1991, play a critical role in combatting illegal telemarketing.

3.      Plaintiffs bring this action to enforce the TCPA in the face of rampant illegal telemarketing in the home-security industry. Telemarketing abuses are enabled through a compensation structure between alarm manufacturers (such as Defendants UTC and Honeywell), alarm-monitoring companies (such as Defendant Monitronics), and alarm dealers (such as Defendants VMS/Alliance and ISI Alarms).

4.      Under this business structure, alarm dealers receive large cash payments or equipment discounts when they sell manufacturers' alarm systems and assign alarm-monitoring contracts to the alarm-monitoring companies. To facilitate the sales, the bigger companies like UTC, Monitronics and Honeywell permit their much smaller dealers to use their trademarks and trade names, access their proprietary customer-service databases and pricing information, and

hold themselves out as authorized dealers of the much larger, better known, and more reputable companies.

5.      All sales participants benefit from the arrangement. Alarm manufacturers, who have no direct-to-consumer sales efforts, are able to sell tens of millions of dollars of their products through a new retail channel. Alarm-monitoring companies such as Monitronics also have no direct-to-consumer sales functions, and, through their dealers' efforts, are able to secure hundreds of thousands of lucrative alarm-monitoring contracts.  And dealers receive tens of millions of dollars for generating new business for their sales partners.

6.      Nothing is inherently wrong with this business model. Problems arise, however, when authorized dealers, emboldened by the rewards they receive from the manufacturers and alarm-monitoring companies, resort to illegal telemarketing to generate business.

7.      In many instances, including here, the manufacturers and monitoring companies turn a blind eye to their dealers' illegal telemarketing, and gratefully accept the new business they generate. The manufacturers and monitoring companies take the view that compliance is the dealers' sole responsibility, and fall back on self-serving contractual provisions that purport to shield them from liability for the illegal telemarketing campaigns that generate millions of dollars of business for them.

8.      Under the TCPA, these efforts to shirk responsibility fail. The TCPA imposes liability not only on the entities that physically dial illegal telemarketing calls, but also on those entities that benefit from them.

9.      Vicarious liability is an essential feature of the remedial provisions and purposes of the TCPA. According to the FCC, the agency charged with interpreting the statute, a seller is not shielded from liability simply because *others* violate the law on its behalf and for its benefit.

This is so in part because the dealers and lead-generators that place illegal calls often are judgment proof and difficult to identify, and sellers are best positioned to monitor and control their activities. Under these circumstances, and in service of protecting consumers from the nuisance and privacy-invasion of unwanted telemarketing, liability is imputed to the more reputable and more financially solvent sellers such as Monitronics, UTC, and Honeywell.

10.     This case implicates the critical nature of vicarious liability under the TCPA. Here, comparatively small dealers placed millions of illegal telemarketing calls to sell UTC and Honeywell alarm-systems and generate alarm-monitoring business for Monitronics.

11.     Plaintiffs bring the action to enforce the TCPA's strict limits on telemarketing calls placed through automated telephone dialing systems ("ATDS") and artificial or prerecorded voice messages, and calls placed to numbers listed on the Do Not Call Registry. On behalf of the proposed classes defined below, Plaintiffs seek statutorily-authorized damages of $500-$1500 per illegal call, as well as injunctive relief requiring Defendants to comply with the law.

## II.  JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2).  This matter in controversy exceeds $5 million, as each member of the proposed classes of tens of thousands is entitled to up to $1500 in statutory damages for each unlawful call. Further, Plaintiffs reside in multiple states, and allege national classes, which results in at least one class member belonging to a state different than one or more of the Defendants. Therefore, both elements of diversity jurisdiction under the Class Action Fairness Act of 2005 are present, and this Court has jurisdiction.

13.     This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this action involves violation of a federal statute, the TCPA.

14.     Venue is proper in this District under 28 U.S.C. §§ 1931(b)-(c) and 1441(a), because the Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction at the time the action is commenced, and because Defendants' contacts with this District are sufficient to subject them to personal jurisdiction.

15.     Venue for the coordinated pretrial proceedings is also proper in this District pursuant to the Transfer Order issued by the JPML.

16.     Venue in the districts in which the underlying cases were originally filed was also proper for the reasons set forth by Plaintiffs in their original complaints.

### III.  PARTIES AND DEFINITIONS

17.     This action is brought by the following Plaintiffs:

    a.  Jason Bennett, a resident of Alabama;

    b.  Edith Bowler, a resident of Washington;

    c.  Philip J. Charvat, a resident of Ohio;

    d.  Scott Dolemba, a resident of Illinois;

    e.  Michael and Janet Hodgin, residents of Washington;

    f.  James "Garry" Hough, a resident of North Carolina;

    g.  Diana Mey, a resident of West Virginia; and

    h.  Kerry O'Shea, a resident of California.

18.     The action is brought against the following Defendants:

    a.  Alliance Security, Inc., a Delaware corporation. Alliance Security, Inc. is the new corporate name of Versatile Marketing Solutions, Inc., d/b/a VMS Alarms, a Rhode Island corporation. In this complaint, Alliance Security is

referred to as "VMS/Alliance," or sometimes "VMS." VMS/Alliance is an alarm-systems dealer.

b.  Honeywell International, Inc., a Delaware corporation that manufactures and sells alarm systems.

c.  ISI Alarms NC, Inc., a North Carolina corporation and former alarm-systems dealer.

d.  Kevin Klink and Jayson Waller, residents of North Carolina who owned and operated ISI Alarms at the time the telemarketing calls at issue were placed.

e.  Monitronics International, Inc., a Texas corporation. Monitronics is an alarm-monitoring company.

f.  UTC Fire and Americas Corporation, Inc., a Delaware corporation.  It sometimes does business as GE Security, and is referred to herein as "UTC," "GE Security" or "GE." UTC is an alarm-systems manufacturer.

19.  As used in this Complaint, the term:

a.  "Monitronics Authorized Dealer" means a security-systems dealer who has or had an agreement with Monitronics that permits it to hold itself out as an authorized dealer or distributor of Monitronics services, and who uses telemarketing in its sales efforts;

b.  "Honeywell Authorized Dealer" means a security-systems dealer who has or had an agreement with Honeywell that permits it to hold itself out as an authorized dealer or distributor of Honeywell security products, and who uses telemarketing in its sales efforts; and

    c. "UTC Authorized Dealer" means a security-systems dealer who has or had an agreement with UTC that permits it to hold itself out as an authorized dealer or distributor of UTC or GE Security products, and who uses use telemarketing in its sales efforts.

20.    VMS/Alliance is or was a Monitronics Authorized Dealer and UTC Authorized Dealer.

21.    ISI Alarms is or was a Monitronics Authorized Dealer and Honeywell Authorized Dealer.

22.    Defendants Waller and Klink are liable for ISI's conduct because:

    a.  They are or were officers or agents of ISI, and are subject to liability for its violations of the TCPA under 47 U.S.C. § 217;

    b.  they personally authorized the conduct that the Plaintiffs allege violated the TCPA; and

    c.  they directed and instructed ISI employees and other agents to engage in conduct that violates the TCPA.

## IV.  APPLICABLE LAW

**A.**    **TCPA § 227(b) regulates autodialer and artificial or prerecorded voice calls to cellular and residential phones.**

23.    47 U.S.C. § 227(b) regulates so-called "robocalls"—calls placed using an automated telephone dialing system ("ATDS"), and calls using an artificial or prerecorded voice.

24.    Regarding telephone numbers assigned to a cellular telephone service, the statute prohibits calls using an artificial or prerecorded voice, and ATDS calls—other than emergency calls or calls placed with the prior express consent of the called party. *Id.* § 227(b)(1)(A).

25.     With respect to residential telephone lines, the statute prohibits all calls using an artificial or prerecorded voice—again, other than emergency calls or calls made with prior express consent. *Id.* § 227(b)(1)(B).

26.     In other words, with respect to nonconsensual, nonemergency calls to *cell phones*, both ATDS and artificial/prerecorded voice calls are prohibited; with respect to nonconsensual, nonemergency calls to *residential phones*, only artificial/prerecorded voice calls are prohibited.

27.     The TCPA requires prior express consent from the called party with respect to calls placed to both cell phones and residential phones. Prior express consent is consent that is clearly and unmistakably conveyed by the call recipient to the party placing the call; implied consent is not sufficient.

28.     Persons who receive calls in violation of these provisions may bring an action to recover the greater of the monetary loss caused by the violation, or $500. *Id.* § 227(b)(3). If the Court finds the defendant willfully or knowingly violated § 227(b), the Court may increase the award to up to $1500 per violation. *Id.*

**B.      TCPA § 227(c) regulates telemarketing calls made to phone numbers listed on the Do Not Call Registry.**

29.     Consumers who do not want to receive telemarketing calls may indicate their preference by registering their telephone numbers on the national Do Not Call Registry. *See* 47 C.F.R. § 64.1200(c)(2). According to the FTC, the Registry, which was established in 2003, currently has over 223 million active registrations. A listing on the Registry must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator. *Id.*

30.     Because a telephone subscriber listed on the Registry must take an affirmative step to register his or her number, a telemarketer who wishes to call a person listed on the

7

Registry must take a similarly affirmative step, and must obtain the registrant's **signed, written agreement** to be contacted by the telemarketer. *Id.* § 64.1200(c)(2)(ii). The written agreement must also include the telephone number to which the calls may be placed. *Id.*

31.     A person whose number is on the Registry and has received more than one telephone solicitation within any twelve-month period by or on behalf of the same entity in violation of the TCPA, can sue the violator and seek the same statutory damages available under § 227(b)—the greater of actual damages or $500, a figure that may be trebled for willful or knowing violations.  47 U.S.C. § 227(c)(5).

32.     Telemarketers who wish to avoid calling numbers listed on the Registry can easily and inexpensively do so by "scrubbing" their call lists against the Registry database. The scrubbing process identifies those numbers on the Registry, allowing telemarketers to remove those numbers and ensure that no calls are placed to consumers who opt-out of telemarketing calls.

**C.     The TCPA imposes liability on entities that do not directly place illegal calls.**

33.     It has long been the law that a seller of goods or services can be liable for TCPA violations even if the seller does not directly place or initiate the calls.

34.     As explained by the FCC, the TCPA and its regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Mem. and Order, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

35.     The FCC reiterated this principle in 2005, when it stated that "a company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules, and calls placed by a third party on behalf of that company are treated as if

the company itself placed the call." *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Request of State Farm Mutual Automobile Insurance Company for Clarification and Declaratory Ruling, Declaratory Ruling, 20 FCC Rcd. 13664, 13667 ¶ 7 (2005).

36.     The FCC reaffirmed this in 2013, when it held (a) with respect to violations of § 227(b), a seller may be liable under principles of apparent authority, actual authority, and ratification for telemarketing violations placed by third parties, and (b) with respect to violations of § 227(c), a seller may be liable under those same principles, and, under the express terms of the statute, for calls placed "on behalf of" the seller. *In re Joint Pet. Filed by Dish Network,* 28 FCCR 6574 (2013).

## V.  FACTUAL BASIS FOR THE COMPLAINT

**A.     Allegations regarding calls placed to Plaintiffs.**

37.     Plaintiffs and their claims are detailed below, but are summarized as follows:

| Plaintiff Name | Call received on | | VMS/Alliance | Direct or vicarious alleged against | | | | Claims | |
| | Residence | Cell | | UTC | Monitronics | Honeywell | ISI | Count 1 | Count 2 |
|---|---|---|---|---|---|---|---|---|---|
| Bennett | | X | | | X | | | X | |
| Bowler | X | | | X | X | | | X | X |
| Charvat | X | | X | X | X | X | X | X | X |
| Dolemba | | X | X | | X | | | X | |
| Hodgin | X | | | X | X | | | X | |
| Hough | X | | X | X | X | | | X | X |
| O'Shea | | X | X | X | X | | | X | X |
| Mey | X | X | X | X | X | X | X | X | X |

38.     Each Plaintiff received illegal telemarketing calls on a residential or cellular telephone line, from or on behalf of the Defendants indicated, who are liable either under theories of direct liability (as in the case of Defendants VMS/Alliance and ISI Alarms) or vicarious liability (as in the case of Defendants Monitronics, UTC, and Honeywell, whose authorized dealers placed the illegal telemarketing calls).

### *Plaintiff Jason Bennett*

39.     In December of 2013, Plaintiff Jason Bennett received numerous illegal prerecorded message calls utilizing at ATDS on his cellular telephone, (xxx) xxx-1830.

40.     During several of the calls, Mr. Bennett, in order to determine who was placing the calls, pressed one to speak with a sales representative. On two occasions, he spoke with a representative named "Ron," who stated he was promoting the sale of home alarm systems and Monitronics alarm-monitoring services.

41.     These calls were placed by or at the direction of one or more Monitronics Authorized Dealers for the purpose of promoting the sale of Monitronics alarm-monitoring services.

42.     The calls were placed from caller IDs (602) 753-9875, (630) 869-1358 (two calls), and (312) 273-1588.

### *Plaintiff Edith Bowler*

43.     Plaintiff Edith Bowler listed her residential telephone number (xxx) xxx-8882 on the national Do Not Call Registry in January of 2008.

44.     Nonetheless, since June of 2012, Ms. Bowler has received numerous illegal prerecorded message calls from or at the direction of:

    a.   UTC Authorized Dealers for the purpose of selling or promoting the sale of
UTC alarm systems; and

    b.   Monitronics Authorized Dealers for the purpose of selling or promoting the
sale of Monitronics alarm-monitoring services.

45.     Ms. Bowler received one such call in October of 2012. The prerecorded message
provided the option of pressing a number on the telephone keypad to speak with a sales
representative. Ms. Bowler did so in order to determine who was placing the call. She spoke with
a representative who told her the company calling her was Monitronics, and directed her to the
Monitronics website for more information about the company.

46.     Ms. Bowler received prerecorded telemarketing messages on two occasions in
January of 2013 that also promoted the sale of alarm systems and monitoring provided by
Monitronics.

47.     In July of 2013, Ms. Bowler received a prerecorded telemarketing message and
again pressed one to speak with a sales representative. The representative identified his company
as Security One, which he said was the "the marketing department for GE." The call also was
placed to promote Monitronics alarm-monitoring services.

48.     On another such call in August of 2013, Ms. Bowler spoke with a sales
representative who identified herself as "Kelly" from "Home Protection." She told Ms. Bowler
the security system offered was a GE system, and that Monitronics would do the alarm
monitoring. Kelly transferred Ms. Bowler to another representative for additional information.
That representative, "Mike," told Ms. Bowler he was a "screener for the marketing company,"
but that "we are Monitronics—we do the monitoring." Mike also directed Ms. Bowler to the
Monitronics website.

49.     In addition to Security One and Home Protection, authorized dealers believed to have placed calls to Ms. Bowler include All Safe Protection Services and Maximum Security.

### *Plaintiff Philip J. Charvat*

50.     Beginning in July of 2012, Plaintiff Philip J. Charvat received numerous live and prerecorded/ATDS calls from ISI attempting to sell him alarm systems manufactured by Honeywell, and alarm-monitoring services provided by Monitronics.

51.     The calls were placed to Mr. Charvat's residential telephone lines, (xxx) xxx-1341, and (xxx) xxx-8940, numbers listed on the national Do Not Call Registry as of September 2011.

52.     On more than one occasion, a telemarketer represented to Mr. Charvat that he or she was an employee representative of Monitronics, Honeywell, or "ISI Honeywell."

53.     From 2009 through 2013, Mr. Charvat also received numerous live and prerecorded calls on his residential telephone line from VMS/Alliance attempting to sell him alarm systems manufactured by UTC, and alarm-monitoring services provided by Monitronics.

54.     Like Ms. Mey, Mr. Charvat received calls from VMS/Alliance after receiving sham "safety survey" calls from Total Survey Solutions, or TSS. The survey calls were placed by TSS, on behalf of VMS/Alliance.

### *Plaintiff Scott Dolemba*

55.     On December 11, 2013, Plaintiff Scott Dolemba received an illegal prerecorded message on his cellular telephone line, (xxx) xxx-6518.

56.     The number displayed on Mr. Dolemba's caller ID was 772-236-0990.

57.     Mr. Dolemba answered the call. The prerecorded message invited him to press a key to speak with a sales representative. Mr. Dolemba did so in order to determine who placed the call.

58.     Mr. Dolemba spoke with an Alliance Security sales representative who was promoting the sale of alarm systems and Monitronics alarm-monitoring services.

### *Plaintiffs Michael and Janet Hodgin*

59.     Plaintiffs Michael and Janet Hodgin placed their residential telephone number (xxx) xxx-6729 on the national Do Not Call Registry in August of 2009.

60.     Nonetheless, in November of 2012, the Hodgins received an illegal prerecorded message call from or at the direction of a Monitronics Authorized Dealer  and UTC Authorized Dealer for the purpose of selling or promoting the sale of their goods or services.

61.     The prerecorded message the Hodgins received gave the option of pressing a number on the telephone keypad to speak with a sales representative. Plaintiff Janet Hodgin did so in order to determine who was behind the call.

62.     Ms. Hodgin was connected to a sales representative named "John" with All Safe Security in Florida. John told Ms. Hodgin that the alarm-system equipment, a GE Security system, was "free," and that she would only be required to pay Monitronics a monthly monitoring fee.

### *Plaintiff James "Garry" Hough*

63.     Plaintiff James "Garry" Hough placed his residential telephone number, (xxx) xxx-7994, on the national Do Not Call Registry in May of 2007.

64.     Nonetheless, since August of 2012, Mr. Hough has received numerous illegal prerecorded message calls from or at the direction of:

13

a. VMS/Alliance;

b. UTC Authorized Dealers for the purpose of selling or promoting the sale of UTC alarm systems; and

c. Monitronics Authorized Dealers for the purpose of selling or promoting the sale of alarm-monitoring services provided by Monitronics.

65.    Several of these calls consisted of prerecorded messages to the effect that the FBI was warning about break-ins or rising crime in the area. On several occasions, Mr. Hough pressed a number to connect to a sales representative as prompted in the message and, when connected, asked the telemarketer to stop calling him.

66.    On one such call, in October of 2012, Mr. Hough spoke with a representative named "Jesse," who gave Mr. Hough the website for his company, www.2giglifestyle.com. At the time, this was the website for DG Security, which stated that DG Security, along with Alliance Security and Monitronics, "strive to be number one in all aspects of their industry."

67.    On another, in June of 2013, Mr. Hough spoke with a sales representative named "Derek," who identified his company as a Monitronics dealer.

68.    On another June 2013 call, Mr. Hough spoke with a sales representative who identified himself as a "middle person," and said the call Mr. Hough received was from Alliance Security.

69.    Minutes after receiving that call, Mr. Hough received a second call, from a representative named "Jabari," who told Mr. Hough the monitoring company was Monitronics.

70.    In August of 2013, Mr. Hough received a prerecorded message, pressed a number to speak with a sales representative, and was connected to a representative named "Lisa." Lisa told him the caller was GE Security, who was working with Monitronics.

14

*Plaintiff Diana Mey*

71.     Plaintiff Diana Mey has two cellular telephone numbers, (xxx) xxx-7421 and (xxx) xxx-1607, and one residential telephone number, (xxx) xxx-1943.

72.     All are listed on the national Do Not Call Registry.

73.     Despite these listings, Ms. Mey received dozens of calls promoting the sale of alarm systems and alarm-monitoring services.

74.     Ms. Mey received illegal live or prerecorded message calls from or at the direction of:

      a.   VMS/Alliance;

      b.   UTC Authorized Dealers for the purpose of selling or promoting the sale of UTC alarm systems;

      c.   Monitronics Authorized Dealers for the purpose of selling or promoting the sale of Monitronics alarm-monitoring services;

      d.   ISI Alarms; and

      e.   Honeywell Authorized Dealers for the purpose of selling or promoting the sale of Honeywell alarm systems.

**Mey allegations regarding VMS/Alliance, Monitronics, and UTC**

75.     Some of the calls Ms. Mey received were sham "safety survey" calls. During these calls, Ms. Mey would receive a call from a representative of an Indian company called "Total Survey Solutions," or "TSS." The caller would purport to be conducting a "safety survey," would ask Ms. Mey whether she owned her own home, and would ask a series of questions about existing security systems in the home. The caller would conclude the call by

telling Ms. Mey that because she had participated in the "survey," she "could be selected" to receive a free GE security system.

76.     In truth, the "survey" was intended to generate, and did generate, thousands of sales leads for VMS, so VMS could generate new accounts for itself, new alarm-monitoring customers for Monitronics, and alarm-system sales for UTC.

77.     TSS would send thousands of sales leads "surveys" to VMS each month. After it received the leads, a VMS representative would call the "survey participant"—here, Ms. Mey. During the course of that call, the representative would inform Ms. Mey that she had "participated in our Home Safety survey" and had been selected to receive a "free" $1200 General Electric wireless security system. According to the script, which included the VMS and Monitronics logos, to receive her free system Ms. Mey would need to pay an activation fee and a monthly monitoring fee.

78.     During several of the calls Ms. Mey received, sales representatives made statements to the effect that the calls were placed on behalf of Monitronics and UTC, and that each was involved in VMS's telemarketing sales campaign. For example:

    a.   On September 15, 2010, Ms. Mey received a telemarketing call from caller ID (352) 352-0352. When Ms. Mey answered the phone, the caller told her she worked for Monitronics. When Ms. Mey began asking questions to determine who was behind the calls, a supervisor informed her he was located in Rhode Island (where VMS is headquartered), but refused to provide additional information and terminated the call after Ms. Mey pressed for more information.

16

b.  On March 23, 2011, Ms. Mey received a call from "Megan with VMS."
    Megan told Ms. Mey that "General Electric" would be giving her a $1200
    security system for free, stated the earlier "survey" that Ms. May received was
    sponsored by General Electric, and characterized the survey as "one of our
    General Electric Safety Surveys."

c.  Later that day, Ms. Mey received a call from a VMS manager named Dennis
    Castro. Mr. Castro emphasized VMS's connection to Monitronics, whom he
    called "the number one monitoring service in the country." He told Ms. Mey
    that VMS/Alliance was GE's "partner," and told her "there's only a handful of
    companies in the world that partners [sic] with General Electric." He also told
    Ms. Mey that GE performed the safety survey.

d.  On another occasion, July 11, 2011—months after Ms. Mey filed suit against
    VMS—Ms. Mey received a call from caller ID "401-654-5377 Providence
    RI."  Ms. Mey spoke with a VMS employee named Matthew Jay who told her
    that "VMS General Electric Alarms" had selected her to receive a $1200
    security system with free installation.

e.  Mr. Jay made representations about the intertwined nature of the relationship
    between the three Defendants. He told Ms. Mey he worked for both General
    Electric and VMS, and described VMS as a "local authorized General Electric
    dealership."

f.  Mr. Jay told Ms. Mey that Monitronics was VMS's alarm monitoring
    company, that VMS was the "same company" as Monitronics, and that GE
    and Monitronics were "same company."

17

g.  On July 25, 2011—again, months after this lawsuit was filed—Ms. Mey
received a call from a man who identified himself as "Ricky from VMS, your
local General Electric dealer," although the caller ID had been manipulated to
falsely reflect that the call was from "POLITICAL RP 406-948-8852."  Ricky
told Ms. Mey he was calling from "the promotional department in Tampa,
Florida," said he would have a manager call her back, but hung up the phone
before Ms. Mey could get more information.

h.  Later that day, a VMS employee named Jeff called Ms. Mey. Jeff reminded
Ms. Mey that he had just spoken with Ricky about the General Electric
Security system. During the course of the call, he represented that GE,
Monitronics, and VMS were separate entities, but were "partners," and that
GE "sponsored" the initial survey.

i.  On July 28, 2011, Ms. Mey received a call from a woman who identified
herself as "Michelle . . . From VMS alarms, your General Electric dealer."
Michelle stated that she was calling because "General Electric has randomly
selected you to receive a new wireless home security system at no charge."
During the call, another employee named "Richard," who identified himself as
a senior supervisor with VMS, came on the line.  Ms. Mey told Richard not to
call her again, and to take her number off his call list.  Ms. Mey told Richard
she wanted a copy of the company's written telemarketing policy, but Richard
hung up on Ms. Mey.

     j.   Beginning October 26, 2011, Ms. Mey received a series of calls, some from

numbers with blocked caller IDs, from callers purporting to be calling from

GE and Monitronics.

     k.   On an earlier occasion, Ms. Mey spoke with a VMS representative and asked

to speak with a manager about the services.  A manager named "Ryan" called

Ms. Mey from a number identified on her caller ID as originating from "401-

533-9592 MONITRONICS."

79.    The prerecorded messages played during the calls to Ms. Mey often had messages

similar to those received by other Plaintiffs. For example:

> The FBI reports there is a crime every fifteen seconds.  It is also reported
> that one in three people over the age of sixty-five fall in any given year.
> Do not become one of these statistics.  Press one now to find out how you
> can get a complete security system with installation.  Thank you and
> congratulations.  If you would like to have your phone number removed,
> press two now.  Otherwise, press one to speak to a representative.  Thank
> you.

and

> The FBI reports there is a home break in every fifteen seconds.  Your local
> police recommend you protect your home. If you would allow us to stick a
> small sign in your yard, we will install a new security system at absolutely
> no cost to you whatsoever. To hear more, press one now.  To be placed on
> our do not call list, press nine.

80.    When Ms. Mey would speak with a sales representative to determine the origin of

these calls, she often was informed that Alliance was calling her regarding a free home security

system that she had won, and that Alliance would be installing the alarm and Monitronics would

monitor the system.

81.    On one such call in August of 2013, Ms. Mey was informed that Monitronics

would be doing the monitoring.

82.     In addition to VMS/Alliance, the authorized dealers who are believed to have placed calls to Ms. Mey include Space Co. Security, FGF Alarms, and Home Secure Solutions.

**Mey allegations regarding ISI Alarms, Monitronics, and Honeywell**

83.     Since March 7, 2012, Ms. Mey has received numerous calls from ISI attempting to sell her alarm systems manufactured by Honeywell, and alarm-monitoring services provided by Monitronics.

84.     The calls were made by live telemarketers and by using an autodialer to deliver a prerecorded message.

85.     On more than one occasion, a telemarketer represented to Ms. Mey that he or she was a representative or employee of "Honeywell" or "ISI Honeywell."

### *Plaintiff Kerry O'Shea*

86.     Since November of 2012, Plaintiff Kerry O'Shea has received numerous illegal telemarketing calls on his cellular telephone, (xxx) xxx-6734, a number he listed on the national Do Not Call Registry on January 18, 2012.

87.     These calls were placed by or at the direction of:

    a.  VMS/Alliance;

    b.  UTC Authorized Dealers for the purpose of selling or promoting the sale of UTC alarm systems; and

    c.  Monitronics Authorized Dealers for the purpose of selling or promoting the sale of Monitronics alarm-monitoring services.

88.     Several of these calls used prerecorded messages and automatic telephone dialing systems, or ATDS.

89.     During the course of one such call in June of 2013, Mr. O'Shea spoke with a representative named "Melissa," who was calling on behalf of Alliance and Monitronics. Mr. O'Shea asked to be placed on their internal do no call list. To ensure that this was done, Mr. O'Shea asked to speak with a supervisor, and was transferred to "Daniel," who confirmed Mr. O'Shea would be placed on the caller's internal do not call list.

90.     On another such call in July of 2013, Mr. O'Shea spoke with a representative named "Samuel," who was calling on behalf of Alliance and Monitronics. Mr. O'Shea asked to be placed on their internal do not call list.

91.     During another call that month, Mr. O'Shea spoke with a representative of Alliance named "Jeremy." Jeremy told Mr. O'Shea it was a waste of time to be put on the do not call list.

92.     During yet another call a few months later, Mr. O'Shea received a prerecorded message promoting the installation of a GE alarm system. To determine who was placing the call, Mr. O'Shea was connected via an interactive voice recording to a representative named "Bruce," located in Tampa, Florida. Bruce identified the security system as a GE system, identified his company as Alliance Security, and identified Monitronics as the company that would do the monitoring.

93.     In January 2014, Mr. O'Shea received an ATDS call, answered, and heard a brief period of music before a representative came on the line. The representative stated he was calling from Alabama, for Safe Home Technologies and Monitronics. Mr. O'Shea again asked for the calls to stop, and asked to be placed on the companies' internal do not call list.

**B.       VMS/Alliance placed telemarketing calls in violation of the TCPA.**

94.      VMS/Alliance is liable under all Counts for placing calls as alleged above.

95.      VMS is liable under Count One (47 U.S.C. § 227(b)(1)) because it or its agents used an ATDS or artificial or prerecorded voice to place nonexempt calls to cellular or residential telephones without the recipient's prior express consent.

96.      VMS is liable under Count Two (47 U.S.C. § 227(c)) because it or its agents placed telemarketing calls to numbers on the DNC Registry without the recipient's signed, written agreement to receive telemarketing calls.

**C.       ISI Alarms placed telemarketing calls in violation of the TCPA.**

97.      ISI Alarms is liable under all Counts for placing calls as alleged above.

98.      ISI Alarms is liable under Count One (47 U.S.C. § 227(b)(1)) because it or its agents used an ATDS or artificial or prerecorded voice to place nonexempt calls to cellular or residential telephones without the recipient's prior express consent.

99.      ISI Alarms is liable under Count Two (47 U.S.C. § 227(c)) because it or its agents placed telemarketing calls to numbers on the DNC Registry without the recipient's signed, written agreement to receive telemarketing calls.

**D.       UTC is liable for the TCPA violations of UTC Authorized Dealers.**

100.     With respect to telemarketing calls placed to Plaintiffs and putative class members, UTC is liable for the TCPA violations of UTC Authorized Dealers because:

a.   UTC Authorized Dealers placed calls on behalf of, and for the benefit of, UTC;

b.   UTC Authorized Dealers placed calls under UTC's actual authority;

c.   UTC Authorized Dealers placed calls under UTC's apparent authority; or

d.  UTC ratified the illegal conduct of UTC Authorized Dealers.

101.  The following facts support these allegations:

a.  UTC does not sell alarm systems directly to homeowners or businesses. Instead, it puts its products into the hands of consumers solely through the retail sales efforts of others, including UTC Authorized Dealers.

b.  UTC sells its alarms to a middleman, EDIST Distribution Company, which then sells them to UTC Authorized Dealers.

c.  UTC sets the prices EDIST may charge to UTC Authorized Dealers.

d.  UTC also deals directly with UTC Authorized Dealers. For example, it recruited VMS/Alliance's president, Jay Gotra, to become a UTC Authorized Dealer in approximately 2008-2009, and knew at the time that VMS/Alliance obtained customers through telemarketing.

e.  UTC extends special pricing and volume-purchase discounts to UTC Authorized Dealers. For UTC, the goal of this arrangement is to have those dealers purchase all of their alarm systems from UTC.

f.  The relationships between UTC and UTC Authorized Dealers are dictated by agreements that subject the Authorized Dealer to UTC's control.

g.  For example, the VMS/Alliance-UTC relationship is governed by a Dealer Agreement executed on June 1, 2009. Under this agreement:

(i)  VMS/Alliance may hold itself out to the public as a "GE Security Authorized Dealer," or as a "GE authorized dealer."

(ii)  VMS/Alliance must exclusively purchase UTC security products when entering into contracts with consumers.

(iii) VMS/Alliance is obligated to "promote, market and sell [UTC] security products."

(iv) UTC is obligated to provide sales training to VMS/Alliance regarding the UTC products sold.

(v) VMS/Alliance is required to purchase a minimum number of security kits per month in order to obtain better pricing on GE Security products.

h. UTC has similar contracts with other UTC Authorized Dealers who it permits to hold themselves out as authorized to promote, market and sell UTC products.

i. UTC benefits from its relationships with UTC Authorized Dealers because they purchase large quantities of UTC products. For example, in 2010, VMS/Alliance spent approximately $2.3 million on UTC equipment.

j. UTC's dealer agreements also provide for rebates for products sold, in addition to special pricing.  With respect to VMS/Alliance, the rebates are given as a credit that UTC instructs EDIST to give VMS/Alliance when purchasing more UTC products.

k. As a way to grow their business relationship, UTC and VMS/Alliance negotiated a marketing agreement in order to aid VMS's marketing costs— even after this lawsuit was filed, and after UTC knew VMS/Alliance was the subject of scores of illegal telemarketing complaints.

l. UTC has known for years that some UTC Authorized Dealers, including VMS/Alliance, use "lead generators" to generate telemarketing sales leads, and was aware of the TCPA-compliance risks of working with lead

generators. Despite this knowledge, UTC offered its Authorized Dealers no or inadequate training regarding telemarketing compliance, and failed to take effective action to stop them from violating the TCPA.

m.  UTC also has known for years that hundreds of consumers and government agencies have lodged illegal telemarketing complaints against its Authorized Dealers, but UTC failed to take effective action to stop the illegal conduct. For example, in July of 2010, the Attorney General for the State of Pennsylvania fined VMS/Alliance for telemarketing in violation of Pennsylvania's Do Not Call registry, but UTC took no action against it in response.

n.  To the contrary, despite knowing VMS/Alliance was the subject of numerous illegal telemarketing complaints, that same year UTC awarded VMS/Alliance a top national sales award, the "UTC Fire & Security Liberty Award," for its business-generation efforts.

o.  UTC only terminated the dealer after the Court granted partial summary judgment against VMS/Alliance, and found that its claimed "opt-in consent" or "survey consent" was insufficient to allow it to place telemarketing calls to telephone numbers listed on the national Do Not Call Registry.

p.  These facts demonstrate UTC's corporate policy of disregard for TCPA compliance. This policy has resulted in widespread illegal telemarketing by UTC Authorized Dealers with respect to Plaintiffs and putative class members.

**E.      Monitronics is liable for the TCPA violations of Monitronics Authorized Dealers.**

102.    With respect to the telemarketing calls placed to Plaintiffs and putative class members, Monitronics is liable for the TCPA violations of Monitronics Authorized Dealers because:

    a.   Monitronics Authorized Dealers placed the calls on behalf of, and for the benefit of, Monitronics;

    b.   Monitronics authorized dealers placed the calls under Monitronics' actual authority;

    c.   Monitronics authorized dealers placed the calls under Monitronics' apparent authority; or

    d.   Monitronics ratified the illegal conduct of Monitronics Authorized Dealers.

103.    The following facts support these allegations:

    a.   Monitronics does not sell monitoring services directly to homeowners or businesses. Instead, it obtains monitoring contracts solely through the retail sales efforts of others, including Monitronics Authorized Dealers.

    b.   Some Monitronics Authorized Dealers are exclusive to Monitronics. For example, as an exclusive Monitronics dealer, VMS/Alliance assigns 99% of all its monitoring contracts to Monitronics, which has a right of first refusal to purchase all of its monitoring contracts. For the very small number of contracts VMS/Alliance does not sell to Monitronics, it hires Monitronics to provide monitoring services.

    c.   The relationships between Monitronics and its Authorized Dealers are dictated by agreements that subject the dealers to Monitronics' control.

d.   For example, VMS/Alliance and Monitronics are parties to an Alarm
     Monitoring Purchase Agreement. The Agreement imposes a host of
     requirements on VMS/Alliance, including:

   (i)   Monitronics requires VMS to maintain an insurance policy with a
         minimum $2 million general aggregate limit, and requires VMS to list
         Monitronics an additional insured on its liability insurance.

  (ii)   Monitronics requires VMS to have customers sign alarm monitoring
         purchase agreements, the terms of which are drafted by Monitronics, and
         are referred to by Monitronics as "approved contracts."  VMS may not
         alter the terms of these contracts.

 (iii)   Monitronics has a right of first refusal with respect to all monitoring
         contracts VMS secures and decides to sell. Monitronics purchases
         approximately 98% of the contracts that VMS offers to it.  Monitronics
         does not have a similar right of first refusal with all of its authorized
         dealers.

  (iv)   Monitronics requires that VMS complete a quality assurance form with
         respect to each monitoring contract sold to Monitronics.

   (v)   Monitronics requires that VMS provide it with a copy of the "sales and
         installation agreement" for all of its customers, despite the fact that
         Monitronics is not originally a party to that agreement.

  (vi)   Monitronics requires VMS to guarantee at least twelve months of revenue
         on each contract sold to Monitronics, and if Monitronics does not realize

that twelve months of funding, a "chargeback" occurs between Monitronics and VMS.

  (vii)  Monitronics has an individual non-solicitation/non-compete agreement with Jasit Gotra, VMS's president, requiring him not to solicit contracts that Monitronics has purchased from VMS.

 (viii)  VMS must pledge *all* of its accounts (including those that Monitronics does not purchase) as a security interest to Monitronics.

  (ix)  Monitronics must obtain "favorable pricing" from UTC for VMS.

e.  Monitronics has similar contracts with other Monitronics Authorized Dealers, including ISI Alarms.

f.  Monitronics grants Authorized Dealers access to Monitronics' "central station" and "dealer website," which allows the dealers to manage their accounts.

g.  Monitronics also regularly uses its Authorized Dealers to service its accounts. For example, for VMS-originated accounts monitored by Monitronics, VMS performs all necessary maintenance.

h.  Monitronics has what it calls a "revenue sharing bonus" or "bonus purchase price" agreement with some of its Authorized Dealers. For example, it shares revenue with VMS/Alliance if it maintains a certain monthly sales volume.

i.  Monitronics describes its relationships with its dealers in terms that demonstrate joint venture, partnership, and agency relationships with those dealers, and in fact is engaged in such relationships with them. For example, Monitronics' website states:

(i) "Our dealer program is unique in the industry with one goal— create happy and successful business partners."

(ii) "When you succeed, we succeed."

(iii) "Whether it's getting the funding you need quickly and reliably or help in developing business processes—Monitronics stands ready to help you reach your goals."

(iv) "Monitronics dealers enjoy shared resources, knowledge and unprecedented support from an industry leader."

(v) "Monitronics supports your business with consulting, training, marketing materials, equipment discounts, and leads distribution programs."

j.   Monitronics has known for years that some of its Authorized Dealers, including VMS/Alliance and ISI Alarms, use lead generators to generate telemarketing sales leads, and is aware of TCPA-compliance risks associated with using lead generators.

k.   Monitronics has also known for years that some of its Authorized Dealers, including VMS/Alliance and ISI Alarms, have been the subject of scores of illegal telemarketing complaints lodged by consumers and government agencies.

l.   Nonetheless, despite this knowledge, Monitronics has provided its Authorized Dealers no or inadequate training regarding TCPA compliance, and has failed to take effective action against them to end the illegal telemarketing.

m.  Monitronics rewards and even celebrates its Authorized Dealers who engage in illegal telemarketing. For example, it has recognized VMS/Alliance with:

29

(i) The "top sales award for 2009" due to the "quantity of contracts offered by VMS/Alliance and purchased by Monitronics";

(ii) Its "Dealer of the Year" award for 2010 in order to "distinguish [VMS] and to encourage other dealers"; and

(iii) A trip to the 2011 Super Bowl, "due to the quality and quantity of contracts" VMS/Alliance sold to Monitronics in the previous year and "to encourage other dealers to try and achieve similar results."

n.   In fact, even after this Court concluded VMS/Alliance lacked valid consent to place telemarketing calls to Plaintiff Mey, and after VMS/Alliance's telemarketing practices were the subject of national news reports, Monitronics has continued to do millions of dollars of business with the company.

o.   These facts reveal Monitronics' corporate-wide policy of disregard for TCPA compliance. This policy has resulted in widespread illegal telemarketing by Monitronics Authorized Dealers with respect to Plaintiffs and putative class members.

**F.   Honeywell is liable for the TCPA violations of UTC Authorized Dealers**

104.   As a manufacturer of alarm systems, Honeywell generally does not sell its products directly to consumers.  Instead, it markets and distributes its alarm systems through authorized dealers, including ISI, who are paid commissions based in part on the amount of Honeywell products they sell.

105.   Honeywell describes its relationships with its dealers in terms that demonstrate joint venture, partnership, and agency relationships with those dealers, and in fact is engaged in such relationships with them.

106.     For example, on its website, Honeywell informs its authorized dealers, "Our success is only possible with your success.  You are our business."

107.     The website also invites dealers to "partner" with Honeywell by selling Honeywell products.

108.     Honeywell has written dealer agreements with its authorized dealers.

109.     Under the dealer agreements, Honeywell allows dealers to use the Honeywell trade name, trademark and service mark to market and sell Honeywell alarm systems.

110.     The dealer agreements give Honeywell the authority to oversee its dealers' conduct.  For example, Honeywell can fine or terminate dealers who violate the law or internal Honeywell policies, including telemarketing laws and policies.

111.     Honeywell gives its dealer access to information normally within Honeywell's exclusive control.  For example, through Honeywell's website and other means, Honeywell dealers can access promotional materials, product guides and pricing information.

112.     Despite its authority, Honeywell has failed to control and prevent its dealers, including ISI, from engaging in and benefiting from illegal telemarketing.

113.     Moreover, Honeywell has received numerous telemarketing complaints from other consumers, and has known that ISI and other authorized dealers were generating business for Honeywell through illegal telemarketing.

114.     Despite this knowledge, Honeywell failed to take effective steps to end this illegal conduct.

115.     Instead, Honeywell profited from and ratified the conduct by continuing to accept and new business generated by ISI and other authorized dealers engaged in illegal telemarketing.

## VI.   CLASS ACTION ALLEGATIONS

116.   Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following classes:

a.   ***The UTC-Monitronics-Alliance Class***: All persons or entities within the United States who received, on or after May 18, 2007, a non-emergency telephone call (excluding TSS Survey Class calls) from or on behalf of UTC, Monitronics, or VMS/Alliance, promoting goods or services:

(i)  to a cellular telephone number through the use of an automatic telephone dialing system or an artificial or prerecorded voice; or

(ii) to a residential telephone number through the use of an artificial or prerecorded voice; or

(iii) to a cellular or residential telephone number registered on the national Do Not Call Registry and who received more than one such call within any twelve-month period.

b.   ***TSS Survey Class:*** All persons or entities within the United States whose telephone numbers were listed on the Do Not Call Registry, and to whom, at any time on or after May 18, 2007, more than one call within any twelve-month period from or on behalf of Defendants UTC, Monitronics, or VMS/Alliance was placed based upon sales leads provided by Total Survey Solutions, promoting goods or services.

c.   ***The Honeywell-Monitronics-ISI Class:*** All persons or entities within the United States who received, on or after April 30, 2008, a non-emergency telephone call from or on behalf of Honeywell, Monitronics, or ISI, promoting goods or services:

(i)  to a cellular telephone number through the use of an automatic telephone dialing system or an artificial or prerecorded voice; or

(ii)  to a residential telephone number through the use of an artificial or prerecorded voice; or

(iii) to a cellular or residential telephone number registered on the national Do Not Call Registry and who received more than one such call within any twelve-month period.

117.     Excluded from the Classes are Defendants; any entities in which they have a controlling interest; their agents and employees; any Judge to whom this action is assigned and any member of such Judge's staff and immediate family; and claims for personal injury, wrongful death and/or emotional distress.

118.     Plaintiffs propose that the following persons serve as class representatives:

a.  **The UTC-Monitronics-Alliance Class:** Plaintiffs Bennett, Bowler, Charvat, Dolemba, Hodgin, Hough, Mey, and O'Shea.

b.  **The TSS Survey Class:** Plaintiffs Mey and Charvat.

c.  **The Honeywell-Monitronics-ISI Class:** Plaintiffs Mey and Charvat.

119.     The class members are identifiable through telephone records and telephone number databases used to transmit calls to class members.

120.     Numerosity is satisfied. There are hundreds of thousands of class members. Individual joinder of these persons is impracticable.

121.     There are questions of law and fact common to Plaintiffs and to the proposed classes.

122.     Plaintiffs' claims are typical of the claims of class members.

123.    Plaintiffs are adequate representatives of the classes because their interests do not conflict with the interests of the class members, they will fairly and adequately protect the interests of the class members, and they are represented by counsel skilled and experienced in class actions.

124.    Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.

125.    The likelihood that individual members of the classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

## VII.    LEGAL CLAIMS

### Count One:

### Violation of § 227(b)(1) for calls made using an ATDS or artificial/prerecorded voice

126.    Each Defendant violated 47 U.S.C. § 227(b)(1) by making calls, either directly or through the actions of others, using an automatic telephone dialing system or an artificial or prerecorded voice to cellular telephone numbers without the prior express consent of the called party, or using an artificial or prerecorded voice to a residential telephone number without the prior express consent of the called party.

### Count Two:

### Violation of § 227(c) for calls placed to numbers listed on the Do Not Call Registry

127.    Each Defendant violated 47 U.S.C. § 227(c) by sending, either directly or through the actions of others, telephone solicitation calls to telephone numbers listed on the national Do Not Call Registry.

## VIII.   RELIEF SOUGHT

Plaintiffs request the following relief:

1.	That the Court certify the classes proposed above under Rule 23(b)(3) of the Federal Rules of Civil Procedure;

2.	For each violation of the TCPA, a $500 penalty awarded to Plaintiffs and each class member;

3.	For each willful or knowing violation of the TCPA, a $1500 penalty awarded to Plaintiffs and each class member;

4.	That the Defendants, and their agents, or anyone acting on their behalf, be immediately restrained from altering, deleting or destroying any documents or records which could be used to identify the members of the classes; and

5.	That Plaintiffs and all class members be granted such other and further relief as is just and equitable under the circumstances.

**Jury trial demanded.**

BAILEY & GLASSER, LLP


By:   /s/ John W. Barrett
    John W. Barrett
    Jonathan R. Marshall
    209 Capitol Street
    Charleston, West Virginia  25301
    Telephone:  (304) 345-6555
    Facsimile:  (304) 342-1110
    Email: jbarrett@baileyglasser.com
    Email: jmarshall@baileyglasser.com

    *Co-Lead Counsel, Liaison Counsel, and*
    *Counsel for Plaintiffs Mey and Charvat*

Beth E. Terrell
Mary B. Reiten
TERRELL MARSHALL DAUDT &
   WILLIE PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
Telephone:  (206) 816-6603
Facsimile:  (206) 350-3528
Email:  bterrell@tmdwlaw.com
Email:  mreiten@tmdwlaw.com

*Co-Lead Counsel and Counsel for
Plaintiffs Bowler, Hodgin, and Hough*

Rob Williamson
Kim Williams
WILLIAMSON & WILLIAMS
936 North 34th Street, Suite 300
Seattle, Washington  98103
Telephone: (206) 466-6230
Facsimile:  (206) 535-7899
Email:  roblin@williamslaw.com
Email: kim@williamslaw.com

*Counsel for Plaintiffs Bowler, Hodgin
and Hough*

Edward A. Broderick
Anthony Paronich
BRODERICK LAW, P.C.
125 Summer St., Suite 1030
Boston, Massachusetts  02110
Telephone:  (617) 738-7080
Email: ted@broderick-law.com

-and-

Matthew P. McCue
LAW OFFICE OF MATTHEW P. McCUE
179 Union Avenue
Framingham, Massachusetts  01790
Telephone:  (508) 620-1166
Facsimile:  (508) 319-3077
Email: mmccue@massattorneys.net

*Counsel for Plaintiffs Mey and Charvat*

36

Ronald A Marron
Alexis Marie Wood
Beatrice Skye Resendes
Kas Gallucci
LAW OFFICES OF RONALD
  A. MARRON
651 Arroyo Drive
San Diego, California  92103
Telephone:  (619) 696-9006
Facsimile:  (619) 564-6665
Email: ron@consumersadvocates.com
Email: alexis@consumersadvocates.com
Email: skye@consumersadvocates.com
Email: kas@consumersadvocates.com

-and-

Douglas J. Campion
LAW OFFICES OF DOUGLAS
  J. CAMPION, APC
409 Camino Del Rio South, Suite 303
San Diego, California   92108
Telephone:  (619) 299-2091
Facsimile:  (619) 858-0034
Email: doug@djcampion.com

*Counsel for Plaintiff O'Shea*

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Francis R. Greene
EDELMAN, COMBS, LATTURNER &
GOODWIN, LLC
120 S. LaSalle Street, 18th floor
Chicago, Illinois 60603
Telephone:  (312) 739-4200
Facsimile:   (312) 419-0379

*Counsel for Plaintiff Dolemba*

John R. Cox
9786-A Timber Circle
Spanish Fort, Alabama 36527
Telephone:  (251) 517-4753

Email:  jrc@jrcoxlaw.com

Earl P. Underwood, Jr.
Kenneth J. Riemer
UNDERWOOD & RIEMER, PC
21 S. Section Street
Fairhope, Alabama 36532
Telephone:  (251) 990-5558
Email:  epunderwood@alalaw.com
Email:  kjr@alaconsumerlaw.com

*Counsel for Plaintiff Bennett*